Martin v. Martin.

J. Fielding Martin v. Serena M. Martin, Samuel Beers, John O'Connor and Henry Wolseley, Executor ad litem, etc.

1.   GIFTS—*Notes as, Can Not Form Ground of Recovery by Donee in Action at Law.*—A note executed without consideration, or solely from love and affection, intended as a mere gift, can not form the ground of recovery by the donee in an action at law against the donor.

2.   SAME—*Revocable Until Executed—Notes and Checks.*—A gift is revocable till executed, and a note intended as a gift from the maker to the payee is but a promise to make a gift, and the gift is not executed

till the note is paid. The same applies equally to checks as a gift by drawer to payee.

3. SAME—*Complete Delivery Necessary.*—In order to constitute a valid gift, there must be a complete delivery of the subject of the gift, either actual or constructive.

4. CHECKS—*What They Transfer.*—In Illinois the check of a depositor upon his banker, delivered to another for value, transfers as between drawer and payee, the title to so much of the deposit as the check calls for.

5. SAME—*When Maker Withdraws Deposit Before Presentment.*—In the case of a check delivered for value, if the maker withdraws his deposit before presentment he commits a fraud upon the payee, and the payee becomes entitled to recover the amount of the check from the drawer.

6. SAME—*When Not Paid or Accepted in the Lifetime of the Drawer, Revoked by Death.*—A check delivered by drawer to payee as a mere gift, and not paid or accepted in the lifetime of the drawer, is revoked by his death, and is not a valid claim against his estate.

7. PRESUMPTIONS—*That Services are Gratuitous.*—Where services are rendered either by or to one admitted into the family as a relative, the presumption of law is that such services are gratuitous, and that the parties do not contemplate payment therefor. This presumption may be overcome by proof either of an express contract between the parties that payment shall be made, or of facts and circumstances which show that both parties, at the time that the services were rendered, intended pecuniary recompense other than that which arises naturally out of the family relation.

**Claim in Probate.**—Error to the Circuit Court of Kendall County; the Hon. GEORGE W. BROWN, Judge, presiding. Heard in this court at the April term, 1900. Reversed and remanded. Opinion filed April 10, 1900.

N. J. ALDRICH and THEODORE WORCESTER, attorneys for plaintiff in error.

ROBERT L. TATHAM and HENRY S. WILCOX, attorneys for defendant in error.

MR. JUSTICE DIBELL delivered the opinion of the court.

Serena M. Martin, one of the three executors of the will of Edward Martin, deceased, filed against the estate of said deceased in the County Court of Kendall County, a claim which (after deducting a duplication of certain items) amounted to $91,642.77. The claim was dismissed by the

County Court for want of prosecution, and appealed to the Circuit Court by claimant. The other executors defended against the claim. J. Fielding Martin, entitled under the will to a certain share of the estate, which would be diminished by the allowance of this claim, and representing several others entitled to shares thereof, obtained leave of the Circuit Court to also appear and defend. Upon a jury trial in the Circuit Court claimant obtained a verdict for $62,080.02 and judgment thereon, but at her costs. J. Fielding Martin prosecutes this writ of error therefrom.

Edward Martin, an unmarried man, died December 3, 1893, at Red Hook, Dutchess county, New York, upon a farm which had been his home for many years, leaving a last will. He owned land in Kendall county, Illinois, and claimed a domicile there, and by his direction his will was there probated, and his estate there administered. Serena M. Martin was his niece, and lived with him from about 1845 till his death. J. Fielding Martin was a nephew of Edward Martin. The relations, family and financial, existing between Edward Martin and Serena M. Martin very fully appear in opinions rendered in prior litigation between the parties to this cause, and reported in Martin v. Martin, 68 Ill. App. 169, and 170 Ill. 18; and in Martin v. Martin, 74 Ill. App. 215, and 174 Ill. 371. Many of the facts there stated are in proof here and we refer to those opinions for a more detailed history of many matters herein referred to. By these former suits it was determined that Serena M. Martin had acquired by valid gifts from Edward Martin securities aggregating in amount about $200,000. She also received from him by gift some years before his death a deed of his farm and home at Red Hook, worth about $20,000. She therefore obtained from him in his lifetime by gifts, about $220,000 worth of real and personal property. By this suit she now claims his estate is also largely indebted to her.

The different items constituting her present claim may be thus classified : First, three packages of checks drawn by Edward Martin in her favor, aggregating $62,080.02, and

by virtue thereof she claims, in the alternative, the moneys which, at the time Edward Martin died, were in the banks named in said checks to his credit, and which the executors afterward withdrew therefrom; second, the proceeds of eleven Minnesota State railroad bonds, sold by Edward Martin in August, 1892, and interest he previously collected thereon; third, interest collected by Edward Martin on ten Minneapolis Street Railway Company bonds; and fourth, interest collected by Edward Martin on Illinois school district bonds, notes secured by Illinois farm mortgages, and notes of the Catholic Bishop of Chicago, secured by mortgages on church property.

First.   Five of the checks were on the First National Bank of Joliet, Illinois, for sums aggregating $8,275, and dated April 13, 1893; five were on the United States Trust Company of New York, for sums aggregating $20,805.02, and dated April 13, 1893; and four were on the United States Trust Company aggregating $33,000, and dated October 14, 1893, the total amount of the checks being $62,080.02. The checks dated April 13, 1893, were placed with other securities in a letter of that date from Edward Martin to claimant.   The letter stated it and its contents were to be "left with Elizabeth to be handed to you," but this letter sealed with the checks inclosed was found by claimant in her box in the safe deposit vault of the bank at Poughkeepsie, some days after Edward Martin's death.   She testified that of her own knowledge Edward Martin placed the letter and contents in that box, but that she had never seen the letter till she opened the box after her uncle's death.   The checks dated October 14, 1893, are shown to have been in her possession in the house several days before Edward Martin died.

These checks never were presented for payment or acceptance during the lifetime of Edward Martin.   A note executed without consideration, or solely for love and affection, intended as a mere gift, can not form the ground of recovery by the donee in an action at law against the donor.   A gift is revokable till executed, and a note intended as a gift

from the maker to the payee is but a promise to make a gift, and the gift is not executed till the note is paid. (Blanchard v. Williamson, 70 Ill. 647; Williams v. Forbes, 114 Ill. 167; Richardson v. Richardson, 148 Ill. 563; Shaw v. Camp, 160 Ill. 425.) This rule applies equally to checks intended as a gift by drawer to payee. Simmons v. Cincinnati Savings Society, 31 Ohio St. 457, 27 Am. R. 521, was a suit on a check delivered as a gift from drawer to payee, where the drawer died before the check was presented for payment. The suit was against the drawee, and not as here against the estate of the drawer, but it was determined on general principles applicable to this case. The court there said:

" The question as to what are the rights of the holder of a check for value against the drawee or drawer, does not arise in this case. Many of the authorities cited by counsel for the plaintiff relate to this question and need not here be considered. The plaintiff claims as the payee of a check delivered to her by the drawer, who intended to transfer to the plaintiff, by way of gift, the fund on which the check was drawn, and the question is, whether before the payment or acceptance of the check by the drawee the gift was executed. It seems clear to us that until the check was either paid or accepted the gift was incomplete, and that in the absence of such payment or acceptance, the death of the drawer operated as a revocation of the check. It is well settled that in order to constitute a valid gift there must be a complete delivery of the subject of the gift, either actual or constructive. The check in the present instance was a mere order or authority to the payee to draw the money, and being without consideration, it was subject to be countermanded or revoked while it remained unacted on in the hands of the payee." (8 Am. & Eng. Ency. of Law, 1320, 1321; 14 Am. & Eng. Ency. of Law, 2d Ed. 1030, 1031.)

It is true that in Illinois the check of a depositor upon his banker, delivered to another for value, transfers to that other, as between drawer and payee, the title to so much of the deposit as the check calls for. This rule is stated, and all the principal cases to that effect in this State cited in Gage Hotel Co. v. Union National Bank, 171 Ill. 531. This

principle can apply only partially to a check donated by the drawer to the payee, without any valuable consideration. In the case of a check delivered for value, if the maker withdraws his deposit before presentment he commits a fraud upon the payee, and the payee becomes entitled to recover the amount of the check from the drawer. But where the check is a mere gift to the payee, no fraud is committed upon him by the withdrawal of the deposit before presentation. If such payee should then sue the drawer for the amount of the check, a plea of want of consideration would be as valid a defense as such plea would be to a note delivered as a mere gift. In other words, if the delivery of a check as a mere gift to the payee can be said to be in this State an appropriation of so much of the drawer's funds in the bank to the payee, yet the appropriation is not complete, but the drawer retains the power to destroy it by withdrawing the funds before presentation; and such withdrawal would not leave the drawer liable to an action by the donee of the check. Therefore, even in Illinois, the gift of a check is not complete till payment or acceptance by the bank upon which it is drawn, and is subject to revocation and is revoked by the death of the drawer before payment or acceptance by the bank. Edward Martin did withdraw all his funds in the First National Bank of Joliet, Illinois, except $1,572.05, after he gave these checks. Therefore, except as to that sum, he revoked the gift of the Joliet checks in his lifetime, and his death revoked them as to that remaining fund. As to the checks given claimant upon the United States Trust Company of New York, they were drawn in New York and payable in New York, and are governed by the laws of that State. It was admitted in the court below, as we understand the several admissions as appearing in the record, that under the laws of New York the delivery of a check does not operate as a transfer or an assignment on the fund in the bank, or any part thereof, and that such a check delivered as a gift, creates no claim whatever against the drawer in his lifetime or against his representatives after his death. (Pabst Brewing Co. v.

Reeves, 42 Ill. App. 154.) It follows that if plaintiff is entitled to recover upon the checks it must be upon the ground that they were delivered to her for a valuable consideration, and not either as a mere gift or for love or affection.

Two considerations are relied upon to support a cause of action upon the checks, viz.: First, the valuable consideration imported by the execution and delivery of the checks, and second, the care and services rendered by claimant to deceased in his lifetime. The checks do not recite that they are for value received. The presumption that they were for a valuable consideration is not at all conclusive, but will yield to the facts disclosed by the evidence. There is no pretense that there had been any financial transactions between the parties which could form the basis for these checks, except the collection by Edward Martin of interest upon securities he had previously given claimant, and that interest, if never otherwise paid (a question we discuss later on), was very much less than the amount of these checks. It is manifest from the evidence that claimant had been an inmate of Edward Martin's family ever since about 1845, when she was a small child, and had been supported and cared for by him, and had nothing but what he gave her. The checks drawn April 13, 1893, were inclosed in a sealed envelope which had never been opened by claimant till after the death of Edward Martin. They were placed by him in her box in the safe deposit vault, in a sealed letter addressed to her, and in the same inclosure were other securities which she has heretofore claimed and secured as mere gifts. The checks of October 14, 1893, were in her possession before his death in the same parcel, covered with "curtain cloth," kept in her clothes closet at home, with other securities which it has been heretofore adjudged were gifts from him to her. The history of the letters, the box and the "curtain cloth" parcel, is given in the former opinions to which we refer. When the cases involving her title to the other securities she received from him, kept in said package in said clothes closet or placed by him in her

box in the bank, were before the courts, she did not claim they were delivered to her as payment for her services to Edward Martin, nor that he was under any obligation to pay her therefor. She then claimed those were gifts, and she then proved her services to deceased, to show a reason why he would be likely to bestow such a generous bounty upon her, and why he must have felt affection toward her, and sought by the moral force of such facts to induce the courts to hold said securities were gifts to her, completely executed in his lifetime. Having obtained final judgment that the bonds, notes and mortgages are hers by gift, she now sets up a legal liability of Edward Martin to pay her for the same services, as a valuable consideration for the checks, which she failed to reduce to cash in his lifetime. We do not think her services to Edward Martin capable of performing this double duty. If she had set up and proved in the former litigation that Edward Martin was legally indebted to her in the sum of $91,000, or any lesser amount, the courts might well have concluded said bonds, notes and mortgages were not mere gifts, but were designed to extinguish all such obligations. By the course pursued claimant has first obtained a determination that she is the owner of about $220,000 worth of property by gift from Edward Martin, and then sets up the same facts to prove that he also owed her at the time of his death over $91,000.

Claimant was admitted to the family of Edward Martin when a mere child. At first she must have received more than she rendered. She was a mere subordinate there till the death of the housekeeper, Serena Martin, claimant's aunt and the sister of Edward Martin, in 1877 or 1878. Edward Martin then told claimant that he wanted no more changes, but wanted her to stay with him and take her aunt's place. She replied that she would never leave him. From that time on she acted as his housekeeper till his death, or at least till the home and home farm became hers by his gift, and she did all that a woman in such a position would naturally do for an uncle for whom she had a natural affection, and whose home had been her home already for

Martin v. Martin.

over thirty years.  Where services are rendered either by or to one admitted into the family as a relative, the presumption of law is that such services are gratuitous, and that the parties do not contemplate payment therefor.  This presumption may be overcome by proof, either of an express contract between the parties that payment shall be made therefor, or of facts and circumstances which show that both parties, at the time that the services were rendered, intended pecuniary recompense other than that which arises naturally out of the family relation. (Heffron v. Brown, 155 Ill. 322.)  There is no express contract for payment in this case.  We find no evidence in this case showing that Serena M. Martin expected to charge her uncle for her services or expected him to pay her compensation, and none indicating that Edward Martin ever looked upon himself as under legal obligation to pay her, or ever intended to pay her. All the inferences to be drawn from the evidence exclude the idea that the parties were dealing with each other under any contract relation, or that either supposed or intended that the services either rendered the other were to be charged for or paid for.  Their relations were entirely different.  Edward Martin had been like a father to her.  He had cared for her in early life; what education she had she owed to him; for many years his home had sheltered her and his means had supported her at a time when her presence was not necessary to him.  When in 1877 or 1878, in his old age, her aunt, his housekeeper, died, then he needed claimant's help and care, and she freely gave it.  The dying request of Serena M. Martin to her brother to provide well for claimant tends to show that claimant was regarded as also in need of his care and provision as well as he in need of her services.  That he intended to provide for her future welfare very generously is clear, and that she wholly trusted him to make for her such provision as his generosity might dictate is equally plain.  We think it obvious from the proof that the parties were actuated entirely by the sentiments naturally arising out of the family relation so long existing between them, and that this feeling made claim-

ant the recipient of a large share of her uncle's property by gift, besides the provision in his will placing her on an equality with other nephews and nieces as to the property he retained till his death. We think that under the proofs these checks were just as truly gifts from Edward Martin to claimant as were the bonds, notes and mortgages involved in the previous litigation between the same parties. If the checks had been presented in his lifetime and paid or accepted in his lifetime, the gifts evidenced thereby would have been complete, and claimant could have retained the money. Not having been presented and paid or accepted in his lifetime, the gifts of the checks remained incomplete and unexecuted and must fail.

Second. In 1886 Edward Martin gave claimant eleven Minnesota State railroad bonds, and placed them in her box in the bank, and in 1887 he wrote her that he had made a codicil to his will giving them to her. In his diary, under the date of August 15, 1892, he wrote: "Went to Pough-keepsie to get Minn. 4½ per cent bonds. They have been called and I want to realize on them." He realized on them during that month, and had previously collected interest on them for several years. On October 14, 1892, he placed in claimant's box in the bank Phipps notes amounting to $100,000, secured by mortgage. In Edward Martin's letter to claimant of May 13, 1892, found in her box after his death, he enumerated the securities he had theretofore given her, including these bonds, and in the postscript said:

"Some of the bonds ($30,000) named above as in your box, have matured and been collected, and assignments of other notes and mortgages than those before named will be added to your personal estate from time to time at my convenience and placed in your box in the safe deposit vault, and everything in your box is yours."

We think he meant by this that he intended to put in her box other securities to take the place of those he had collected. This letter was dated before he sold the Minnesota State railroad bonds, and may have been placed in her box before that sale, though it was not designed to reach her

till after his death; but we think it indicates the course he intended to pursue with reference to her securities in said box, and that when, after he withdrew the railroad bonds and collected them, he placed in her box other securities largely in excess thereof, he intended them in part as substitutes for what he had withdrawn. Indeed, that would be the natural inference in the absence of any expression by him. It is not reasonable to suppose that after becoming her debtor for $12,000 or $13,000, by withdrawing these bonds, he meant to leave that obligation unpaid while making her a new gift of securities worth $100,000. By the former suits she has secured the Phipps notes and mortgages as her own, and she has thus been amply remunerated for the railroad bonds he collected in 1892.

Third. The third item, as we have classified the claim, is interest collected by Edward Martin on Minneapolis street railway bonds. It was held in Martin v. Martin, 170 Ill. 18, that Edward Martin had a life estate in these bonds, with remainder to Serena M. Martin at his death. That question is *res adjudicata* between these parties. Hence his estate is not accountable to her for the interest he collected on those bonds during his life.

Fourth. The fourth item is interest Edward Martin collected on school bonds and farm and church mortgages. By the former decisions between these parties it was settled that these securities belonged to claimant by valid gifts from Edward Martin. They therefore became hers when he handed them to her or placed them in her box in the bank. Interest collected by him thereafter upon said securities constitutes a valid claim against his estate, unless she has been paid therefor. J. Fielding Martin testified that at the trial of one of the former causes, Serena M. Martin stated on the witness stand that she had received the interest on the securities and more, too. In connection with this proof the executors put in evidence thirty-two checks of various dates during the period in which Edward Martin collected said interest. These checks were drawn by Edward Martin in favor of Serena M. Martin, and each was indorsed by her, and they amounted in the aggregate to $4,412.75.

In the examination of witnesses these were called by counsel for each side "bank checks" or "checks on the Red Hook bank," but as copied into the record they do not indicate upon whom they were drawn.    In rebuttal claimant testified that at the trial of the previous suit she testified that Edward Martin collected the interest and placed it to his account, and then drew checks to her to strengthen her bank account, and that she referred to the checks on the Red Hook bank offered in evidence; that that was the way Edward Martin did her business.    On cross-examination she stated at the trial referred to she testified she had received all the interest, but did not say "and more, too." It may be it was not competent for her to give that testimony on the former trial, if it had been objected to, but it here appears that she did so testify at that time. That testimony was then material in her favor.    It was there contended that the fact that Edward Martin frequently went to her box, took out the securities it was claimed he had previously given her and collected the interest thereon and placed it to his own credit in the bank, showed that he had not parted with dominion over the securities but used them as his own.    This proof from Serena M. Martin tended to refute that position by showing that he paid her the interest after he had collected it, and therefore acted for her in collecting it.    It seems clear that in that testimony she did not refer to the checks in suit here, part of which she never saw until after her uncle's death, and the rest of which were drawn less than two months before his death and were never used by her, and none of which had been used "to strengthen her bank account," but that she referred to checks on the Red Hook bank such as those offered in evidence by the defense.    In the former suit she had the benefit of her testimony then given, that she received all the interest Edward Martin collected upon her securities, and she ought now to be bound thereby.

There was no special verdict.    But as the verdict is for the precise amount of the face of the checks claimant offered in evidence, including even the two cents on one

check which she omitted from her claim as filed, it is plain the jury found for claimant upon the checks, and found against her as to all her other demands.    We approve their rejection of the other claims, but are also of opinion that under the evidence, and the law applicable thereto, she has not established a cause of action upon the checks.    The instructions are not free from error, but we deem it unnecessary to discuss them.

The judgment is reversed and the cause remanded.